# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 05-4372

_____

Baptist Health, doing business as    *
Baptist Memorial Medical    *
Center-North Little Rock,    *
   *
       Appellant,    *
   *    Appeal from the United States
    v.    *    District Court for the
   *    Eastern District of Arkansas.
Tommy G. Thompson, in his    *
official capacity as Secretary,    *
United States Department of    *
Health and Human Services,    *
   *
       Appellee.    *

_____

Submitted: June 12, 2006
       Filed: August 15, 2006 (Corrected on: 10/27/06)

_____

Before SMITH, HEANEY and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Baptist Memorial Medical Center-North Little Rock ("Baptist Memorial") challenges a decision by the Secretary of the Department of Health and Human Services ("HHS") denying, for Medicare reimbursement purposes, "approved educational activity" status for classroom costs incurred by Baptist Memorial in

connection with its affiliation with a nursing school. The district court[1] upheld the Secretary's decision. For the reasons discussed below, we affirm.

## I. BACKGROUND

HHS administers the Medicare program, 42 U.S.C. § 1395 *et seq.*, through its component Centers for Medicare and Medicaid Services ("CMS"). The Secretary contracts with fiscal intermediaries, such as Blue Cross/Blue Shield in the instant case, to audit the costs submitted by Medicare provider hospitals and approve or disapprove Medicare reimbursement. *See* 42 U.S.C. § 1395h; 42 C.F.R. § 405.902 (defining fiscal intermediary). A provider hospital may appeal the reimbursement decision of the fiscal intermediary to HHS's Provider Reimbursement Review Board ("PRRB"). 42 U.S.C. § 1395oo. The PRRB's decision becomes the final decision of the agency unless the Secretary, on his own motion, decides to affirm, reverse or modify the decision. *Id.* § 1395oo(f)(1).

Prior to 1983, all Medicare-eligible costs incurred by a provider hospital were reimbursed on a "reasonable cost" basis—essentially, each hospital's actual costs incurred were reimbursed dollar-for-dollar so long as the Secretary found the costs reasonable. *See* 42 U.S.C. § 1395f(b). In Title VI of the Social Security Amendments of 1983, Pub. L. 98-21, 97 Stat. 65 (1983) ("PPS legislation"), Congress established the Prospective Payment System ("PPS") as an incentive for hospitals to reduce costs and operate more efficiently. *See* H.R. Rep. No. 98-25, at 132 (1983), *reprinted in* 1983 U.S.C.C.A.N. 219, 351. Under PPS, a provider hospital receives Medicare reimbursement at a flat rate for each patient based on the patient's category of treatment. *Id.*; 42 U.S.C. § 1395ww(d).

---

[1]The Honorable William R. Wilson, Jr., United States District Judge for the Eastern District of Arkansas.

Congress exempted a few costs from PPS, allowing continued reasonable-cost Medicare reimbursement under § 1395f(b) ("pass-through treatment") for, among other things, "approved educational activities." 42 U.S.C. § 1395ww(a)(4). Congress did not define "approved educational activities" in the statute. The Secretary published a regulation stating that approved educational activities included neither "[c]linical training of students not enrolled in an approved education program *operated by the provider*," 42 C.F.R. § 413.85(d)(6) (1986) (emphasis added), nor "[o]ther activities that do not involve the actual operation of an approved education program," *id.* § 413.85(d)(7). During the notice-and-comment phase of the regulation's publication, the Secretary elaborated that "only the costs of those approved medical education programs *operated directly by a hospital* [are] excluded from [PPS]." 49 Fed. Reg. 234, 267 (Jan. 3, 1984) (emphasis added).[2]

In addition to costs for programs that would qualify as approved educational activities under 42 C.F.R. § 413.85, Congress established pass-through treatment for another category of educational-activity costs borne by provider hospitals in § 6205 of the Omnibus Budget Reconciliation Act of 1989 ("OBRA 1989"), Pub. L. 101-239, 103 Stat. 2106 (1989), extended in § 4004(b) of the Omnibus Budget Reconciliation Act of 1990 ("OBRA 1990"), Pub. L. 101-508, 104 Stat. 1388 (1990). This pass-through treatment category includes only the costs of clinical nursing school programs conducted on the premises of, but not necessarily directly operated by, a provider hospital so long as certain conditions specified in OBRA 1990 are met.

---

[2]The Secretary later promulgated a new version of the regulation which expressly includes the requirement of direct operation by the hospital. *See* 42 C.F.R. § 413.85(c)(1), (f) (2001). This version became final in 2001 and is therefore inapplicable to the instant case. The Secretary made the change to "clarify" the previous version of the regulation at issue here. 66 Fed. Reg. 3358, 3361 (Jan. 12, 2001).

In short, educational activities at a provider hospital that do not qualify for pass-through treatment under either 42 C.F.R. § 413.85 or OBRA 1990 are reimbursed as part of the flat-rate PPS payment for the hospital's normal operating costs. Pass-through treatment for educational activities is financially desirable for the provider hospital because the PPS payment for normal operating costs essentially depends only upon the number of patients discharged and their diagnoses, and does not directly compensate the costs of educational activities.[3]

Baptist Memorial is owned and operated by Baptist Health, Inc., a non-profit corporation that also owned and operated three other Medicare-provider hospitals from 1991 to 1994. Baptist Health also owned and operated Baptist School of Nursing ("Nursing School") during that time. The four hospitals and the Nursing School were not separate subsidiary corporations but were each operated as separate business units and maintained separate bookkeeping. Each hospital had its own Medicare provider number, but Baptist Health was the legal entity that contracted for the numbers.

After the institution of the PPS system, Baptist Health allocated the costs of the Nursing School among its four hospitals. Each hospital then characterized its share of those costs as "approved educational activities" and received pass-through reimbursement. In 1990, however, the regional CMS office notified the hospitals' fiscal intermediary that the Nursing School costs were not eligible for pass-through

---

[3]Baptist Memorial asserts that PPS reimbursement for educational activities is actually no reimbursement at all because a provider hospital with educational activities not qualifying for pass-through treatment would receive the same flat-rate PPS payment as an identical provider hospital with no educational activities whatsoever. In making this assertion, Baptist Memorial apparently assumes that such educational activities would have no financially beneficial indirect effects on the operation of the hospital. The record on this issue is not sufficient to allow us to determine whether the assumption is a valid one, and in any event resolution of the issue would have no effect on the outcome of this appeal.

treatment because the provider hospitals did not operate the Nursing School.  In response, in 1991 Baptist Health moved all Nursing School costs to the books of Baptist Medical Center, its hospital in Little Rock, Arkansas.  An allocation of a portion of the Nursing School costs was made from Baptist Medical Center's books to other Baptist Health hospitals, including Baptist Memorial, based on the amount of time nursing students spent at each institution.  Baptist Memorial and the Nursing School executed a Memorandum of Agreement outlining the responsibilities of Baptist Memorial to support the school.

From 1991 to 1994 Baptist Memorial submitted its Nursing School costs for pass-through treatment, but the fiscal intermediary denied reasonable-cost reimbursement.  On administrative appeal, the PRRB reversed, finding that the costs qualified for pass-through treatment as an "approved educational activity" because Baptist Memorial "was engaged in, to a significant extent, the operation of the nursing education program."  The Administrator of CMS, acting under the authority of the Secretary, vacated the PRRB's decision because Baptist Memorial did not directly operate the Nursing School.  However, the Administrator remanded to the PRRB for a determination of whether any of the nursing school costs were qualified clinical costs under OBRA 1990.  On remand, the PRRB approved all submitted clinical costs for pass-through treatment under OBRA 1990 and also reinstated its already rejected finding that the non-clinical, or classroom, costs were eligible for pass-through treatment  as an "approved educational activity."  The Administrator affirmed that the clinical costs were eligible for pass-through treatment under OBRA 1990 but reversed again on the classroom costs because Baptist Memorial did not directly operate the Nursing School.

Baptist Memorial sued for review of the agency's decision in federal district court.  The district court affirmed the Administrator's decision, relying on the D.C. Circuit's resolution of a similar dispute in *Community Care Foundation v. Thompson*, 318 F.3d 219 (D.C. Cir. 2003).  Baptist Memorial now appeals the denial of pass-

through treatment for the classroom costs associated with the Nursing School, arguing that the "direct operation" requirement is not a permissible interpretation of the statute and that it conflicts with the Secretary's prior interpretation. Baptist Memorial also argues that, even under the direct-operation standard, its affiliation with the Nursing School qualified as an "approved educational activity."

## II.    DISCUSSION

The final decision of the Secretary is reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*   42 U.S.C. § 1395oo(f)(1) (incorporating the APA standard of review).   "Under the APA, the Secretary's decision is 'set aside if it is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or contrary to law.'"   *St. Luke's Methodist Hosp. v. Thompson*, 315 F.3d 984, 987 (8th Cir. 2003) (quoting *Hennepin County Med. Ctr. v. Shalala*, 81 F.3d 743, 748 (8th Cir.1996)); *see also* 5 U.S.C. § 706(2)(A), (E).  "We review the district court's decision de novo, making our own independent review of the Secretary's decision under the APA."   *Shalala v. St. Paul-Ramsey Med. Ctr.*, 50 F.3d 522, 527 (8th Cir. 1995).

### A.    The Secretary's Interpretation of the Statute

Baptist Memorial argues that it is arbitrary and capricious for the Secretary to interpret the statutory language "approved educational activity" to include a requirement that the provider hospital directly operate the educational program.  The *Chevron* test determines whether the Secretary's rule is a permissible interpretation of the statute:

> [W]e ask first whether "the intent of Congress is clear" as to "the precise question at issue."   If, by "employing traditional tools of statutory construction," we determine that Congress' intent is clear, "that is the

end of the matter." But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." If the agency's reading fills a gap or defines a term in a reasonable way in light of the Legislature's design, we give that reading controlling weight, even if it is not the answer "the court would have reached if the question initially had arisen in a judicial proceeding."

*Regions Hosp. v. Shalala*, 522 U.S. 448, 457 (1998) (citations omitted) (quoting *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842, 843 & n.9, n.11 (1984)).

Under step one of the *Chevron* analysis, we determine whether the statute makes clear the intent of Congress as to the meaning of the term "approved educational activities." The statute does not expressly define the term, but Baptist Memorial contends that Congress implicitly adopted an existing definition from a pre-PPS Medicare regulation. The term "approved educational activities" was defined in Medicare regulations in 1966 as "formally organized or planned programs of study usually engaged in by providers in order to enhance the quality of patient care in an institution." 20 C.F.R. § 405.421 (1966). Prior to the establishment of the PPS system in 1983, the Secretary adopted the holding of a Seventh Circuit case, *St. John's Hickey Memorial Hospital, Inc. v. Califano*, 599 F.2d 803, 808-09 (7th Cir. 1979), which interpreted the regulation to mean that a provider hospital need only be "engaged in," rather than the "legal operator" of, an educational program for the program to meet the regulatory definition of an "approved educational activity."

In support of its argument that Congress intended to incorporate the definition of "approved educational activities" from 20 C.F.R. § 405.421 (1966) into the 1983 PPS legislation, Baptist Memorial cites *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), and *Bragdon v. Abbott*, 524 U.S. 624 (1998), for the proposition that "Congress' repetition of a well-established term carries the

implication that Congress intended the term to be construed in accordance with pre-existing regulatory interpretations." *Bragdon*, 524 U.S. at 631; *see also Toyota Motor*, 534 U.S. at 193-94. The relevant issue in both *Toyota Motor* and *Bragdon* was the interpretation of the definition of "disability" provided in the Americans with Disabilities Act of 1990 ("ADA"). The Supreme Court noted that the detailed, three-part definition[4] provided in the ADA was drawn "almost verbatim" from the definition of "handicapped individual" in the earlier Rehabilitation Act of 1973, 29 U.S.C. § 706(8)(B), and the definition of "handicap" contained in the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3602(h)(1). *Bragdon*, 524 U.S. at 631; *see also Toyota Motor*, 534 U.S. at 193. In addition, the Court noted that the ADA expressly stated, "Except as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 (29 U.S.C. 790 *et seq.*) or the regulations issued by Federal agencies pursuant to such title." *Toyota Motor*, 534 U.S. at 194 (quoting 42 U.S.C. § 12201(a)); *Bragdon*, 524 U.S. at 631-32 (quoting 42 U.S.C. § 12201(a)). Based on the adoption of identical, detailed language from the earlier statutes and the express reference to the standards set by one of the earlier statutes and its associated regulations, the Court found that the regulations associated with the earlier statute were appropriate sources of guidance for interpreting the terms of the definition in the ADA. *Toyota Motor*, 534 U.S. at 193-94; *Bragdon*, 524 U.S. at 632.

---

[4]The ADA defined "disability" as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

*Toyota Motor* and *Bragdon* do not support the proposition that Congress implicitly intended to incorporate the definition of "approved educational activities" from 20 C.F.R. § 405.421 (1966) into the PPS statutory scheme. First, the ADA adopted an entire three-part, 33-word definition from the relevant earlier statutes, not just a single term; in contrast, the PPS legislation used only the term "approved educational activities" and conspicuously failed to incorporate the associated 24-word definition provided in the earlier regulation. Second, the ADA adopted the definition from earlier statutes, not merely from an agency's regulatory definition, as Baptist Memorial suggests happened in this case. Finally, the ADA expressly referenced the standards developed from the applicable earlier statute and its associated regulations; the PPS legislation does not do so. Under these circumstances, we cannot find any Congressional intent to incorporate the definition of "approved educational activities" from 20 C.F.R. § 405.421 (1966), as elaborated upon in *St. John's Hickey* and its progeny, into the 1983 PPS legislation. Instead, we agree with the D.C. Circuit that Congress, by its silence, left the definition of "approved educational activities" to the Secretary. *Accord Cmty. Care*, 318 F.3d at 225.[5]

We now proceed to step two of the *Chevron* analysis and determine "whether the agency's [definition] is based on a permissible construction of the statute."

---

[5]Baptist Memorial also echoes an argument made, and rejected, in *Community Care* that a lone comment in the legislative history of the PPS legislation proves unambiguously that Congress meant to incorporate the earlier regulatory definition. *See* H.R. Rep. No. 98-25 at 140 (1983), *reprinted in* 1983 U.S.C.C.A.N. 219, 359 (stating that "approved education programs (as defined in current regulation, including nursing education programs) would continue to be paid on the basis of reasonable cost"). However, as the D.C. Circuit aptly noted in regard to this argument, "reviewing legislative history is like 'looking over a crowd and picking out your friends,'" and one "friend" in a crowd as large as this one is insufficient to demonstrate unambiguous Congressional intent. *Cmty. Care*, 318 F.3d at 226 (quoting Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term*, 68 Iowa L. Rev. 195, 214 (1983) (quoting Leventhal, J.)).

*Regions Hosp.*, 522 U.S. at 457 (quotation omitted). In proposing the regulation at issue here, the Secretary described why the definition of the "approved educational activities" made eligible for pass-through treatment in the PPS legislation was important to the policy goals of that legislation:

> We are also amending [20 C.F.R.] § 405.421 [later 42 C.F.R. § 413.85 (1986)] to clarify the definition of allowable costs for medical education, because certain medical education costs are excluded from payment under [PPS]. This was not necessary before, since all the costs were reimbursed on the same reasonable cost basis. However, under [PPS], failure to properly define those medical education costs, for which payment in addition to prospective payments is permitted, could result in unnecessary and inappropriate payments.

48 Fed. Reg. 39752, 39803 (Sep. 1, 1983).

Later, in response to comments on the proposed new regulation, the Secretary explained why a requirement of direct operation of the educational program by the provider hospital was necessary to implement Congress' Medicare goals:

> *Comment* – A number of comments were received concerning whether the pass through of direct education costs is limited to only the costs of those approved medical education programs that a hospital directly operates itself. If this is the case, commenters were concerned that certain costs, such as the costs of clinical training for students enrolled in programs other than at the hospital, may not be excluded from the prospective payment system, but rather are considered to be normal operating costs.

> *Response* – We believe that only the costs of those approved medical education programs operated directly by a hospital be excluded from the prospective payment system. If a program is operated by another institution, such as a nearby college or university, [it] must be noted that by far the majority of the costs of that program are borne by that other

institution, and not by the hospital. While it is true that the hospital may incur some costs associated with its provision of clinical training to students enrolled in a nearby institution, the hospital also gains in return. For example, it obtains the services of the trainee (often at no direct cost to itself). We do not believe that this type of relationship was what Congress intended when it provided for a pass through of the costs of approved medical education programs. Rather, we believe that Congress was concerned with those programs that a hospital operates itself, and for which it incurs substantial direct costs.

We are revising § 405.421(d)(6) [later 42 C.F.R. § 413.85(d)(6) (1986)] to clarify that the costs of clinical training for students enrolled in programs, other than at the hospital, are normal operating costs.

49 Fed. Reg. 234, 267 (Jan. 3, 1984).[6]

The Secretary's explanation of why a direct-operation requirement for "approved educational activities" was necessary to implement Congress' goals for the PPS legislation is eminently "reasonable . . . in light of the Legislature's design." *Regions Hosp.*, 522 U.S. at 457. Therefore, we hold that the Secretary's rule is a permissible interpretation of the statute.

---

[6]Baptist Memorial argues that the specific reference to "clinical training" indicates that the direct-operation requirement was only intended to apply to clinical costs, not classroom costs. However, the reference to "clinical training" occurs in response to some specific concerns raised by commenters. The first sentence of the response indicates that the regulation requires that *all* "approved medical education programs," not just clinical training programs, be "operated directly by a hospital." 49 Fed. Reg. 234, 267 (Jan. 3, 1984).

## B.    The PRRB's Conflicting Prior Interpretations

In three decisions[7] announced between 1993 and 1997, involving cost years from 1987 to 1989, the PRRB analyzed "approved educational activities" under the *St. John's Hickey* "engaged in" standard, rather than the more strict direct-operation standard originally associated with 42 C.F.R. § 413.85(d)(6) (1986).  The Secretary declined review of those decisions.  Baptist Memorial argues that it is arbitrary and capricious for the Secretary now to change his interpretation and apply the direct-operation standard in this case.[8]  We disagree.

When we evaluate an agency's change of position,

> the mere fact that an agency interpretation contradicts a prior agency position is not fatal.  Sudden and unexplained change or change that does not take account of legitimate reliance on prior interpretation may be arbitrary, capricious or an abuse of discretion.  But if these pitfalls are avoided, change is not invalidating, since the whole point of *Chevron* is

---

[7]The three PRRB decisions are *St. Mary's Med. Ctr. v. Blue Cross/Blue Shield*, PRRB No. 97-D82 (July 15, 1997); *Barberton Citizens Hosp. v. Blue Cross/Blue Shield*, PRRB No. 94-D61 (July 28, 1994); and *St. Ann's Hosp. v. Blue Cross/Blue Shield*, PRRB No. 93-D61 (July 21, 1993).

[8]As a corollary, Baptist Memorial argues that the change in position violates Medicare rule-change procedures in 42 U.S.C. § 1395hh(a)(2) ("No rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing . . . payment for services . . . shall take effect unless it is promulgated by the Secretary by regulation . . . .").  However, we agree with the courts that have held that this provision imposes no standards greater than those established by the APA.  *See, e.g.*, *Erringer v. Thompson*, 371 F.3d 625, 633 (9th Cir. 2004) (rejecting an argument that § 1395hh(a)(2) "creates a requirement for promulgation by regulation broader than that of the APA").  Therefore, our analysis under the APA applies also to Baptist Memorial's § 1395hh(a)(2) argument.

-12-

to leave the discretion provided by the ambiguities of a statute with the implementing agency.

*Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996) (internal citations and quotations omitted).

Baptist Memorial argues that "[w]here an agency applies different standards to similarly situated entities and fails to support this disparate treatment with a reasoned explanation and substantial evidence in the record, its action is arbitrary and capricious and cannot be upheld." *Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005). Our closest case on point is *SSM Rehabilitation Institute v. Shalala*, 68 F.3d 266 (8th Cir. 1995). In that case, to determine whether the Secretary's application of a regulation to SSM was an arbitrary change of position, we relied on contemporaneous decisions of the PRRB that applied the same regulation. *Id.* at 270. Because the contemporaneous final decisions, as rendered by the PRRB, were consistent with the decision of the Secretary regarding SSM, we held the Secretary's decision was not an arbitrary change of position. *Id.* Our holding in *SSM* suggests that if the Secretary's interpretation in a case is inconsistent with contemporaneous final decisions rendered by the PRRB, the change would be arbitrary. In the instant case, however, while the three prior decisions cited by Baptist Memorial are inconsistent with the Secretary's decision, they are not *contemporaneous* decisions of the agency. The instant case deals with the cost years 1991 to 1994, while the three previous decisions covered cost years 1987 to 1989. The first decision of the Administrator, on behalf of the Secretary, applying the direct-operation standard in this case was issued in 2001, while the three previous decisions were issued between 1993 and 1997. As a result, *SSM* does not suggest a finding of arbitrariness here. Contrary to Baptist Memorial's assertion, because different cost years were involved in the three PRRB decisions, this is not a case "[w]here an agency applie[d] different standards to similarly situated entities." *Burlington N. & Santa Fe Ry. Co.*, 403 F.3d at 777.

-13-

More generally, we do not find the Secretary's decision to apply the direct-operation requirement after the three earlier PRRB decisions to be "sudden and unexplained." *Smiley*, 517 U.S. at 742. The Secretary has explained fully the underlying rationale for the direct-operation test, as discussed *ante*, and the change as applied to cost years 1991 through 1994 was not sudden because HHS notified Baptist Memorial and its sister hospitals beforehand, as memorialized in an August 1990 letter, that the Nursing School costs would not be eligible for pass-through treatment because the provider hospitals did not operate the Nursing School. Again, we agree with the D.C. Circuit, which held in regard to an identical argument based on the same three prior PRRB cases, "All that we or the regulated entity can properly ask of the agency is that it explain its departure. This the Secretary has expressly done." *Cmty. Care*, 318 F.3d at 227.

Neither is the Secretary's decision contrary to "legitimate reliance on prior interpretation" in the PRRB decisions. *Smiley*, 517 U.S. at 742 (citing *United States v. Penn. Indus. Chem. Corp.*, 411 U.S. 655, 670-675 (1973) and *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 295 (1974)). Legitimate reliance on prior administrative decisions can be shown where "some new liability is sought to be imposed on individuals for past actions which were taken in good-faith reliance on [agency] pronouncements." *Bell Aerospace*, 416 U.S. at 295. In this case, the arrangement between Baptist Memorial and the Nursing School beginning in 1991 could not have been made in reliance on the PRRB decisions, which were announced between 1993 and 1997.[9]

---

[9]Baptist Memorial also argues that it relied on the Secretary's Provider Reimbursement Manual ("PRM"), which as late as 1995 continued to state that non-provider-operated educational activities meeting the "engaged in" test were eligible for pass-through treatment. However, "[t]he PRM, while a useful guide to interpreting the Medicare statute and regulations, is not strictly binding on the Secretary." *Paragon Health Network, Inc. v. Thompson*, 251 F.3d 1141, 1147 (7th Cir. 2001). Reliance on the PRM would not have been reasonable in light of the

We conclude that it is not arbitrary and capricious for the Secretary to apply the direct-operation standard in this case.

## C.      Application of the Direct-Operation Standard

We review the Secretary's decision, made under the direct-operation standard, that Baptist Memorial's classroom costs associated with the Nursing School do not qualify for pass-through treatment to determine if it is supported by substantial evidence in the record as a whole. *Flanery v. Chater*, 112 F.3d 346, 349 (8th Cir. 1997). We find that substantial evidence supports the Secretary's finding that Baptist Memorial was not the operator of the Nursing School.

Baptist Memorial does not challenge the Secretary's findings that "[t]he responsibilities associated with the operation of a nursing program reside with the School of Nursing, not the Provider" and "the costs at issue were not directly incurred by the Provider, but rather were allocated to the Provider." Instead, Baptist Memorial contends that the Nursing School is operated by a provider because Baptist Memorial and the Nursing School are part of a single corporation, Baptist Health. This argument fails. The Secretary correctly noted that, while Baptist Health is a corporation that operates several provider hospitals and nursing schools, it does not itself qualify as a provider under the statute. *See* 42 U.S.C. § 1395x(u) ("The term 'provider of services' means a hospital, critical access hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, home health agency, [or] hospice program . . . ."). Moreover, the fact that a provider hospital and an educational institution are under common ownership does not circumvent the regulations that determine when the costs of the educational institution are attributable to the provider hospital for Medicare purposes. *See Thomas Jefferson*

direct communication from HHS in August 1990 asserting that the direct-operation requirement contained in the regulations would be applied.

*Univ. v. Shalala*, 512 U.S. 504 (1994) (affirming that a medical college could not redistribute some costs of an approved educational program to an associated provider hospital where both were owned and operated by the same legal entity).

In short, the Medicare reimbursement system is based on the costs incurred by individual provider hospitals, without regard to underlying ownership structure. Indeed, if Baptist Memorial's common-ownership reimbursement theory were accurate, there would be no need for each of the four hospitals owned and operated by Baptist Health to have separate Medicare provider numbers. We conclude that substantial evidence supports the Secretary's finding that Baptist Memorial was not the operator of the educational activity.

## III.   CONCLUSION

We hold that the direct-operation requirement is a permissible interpretation of "approved educational activities" and that it does not represent an arbitrary change from the Secretary's prior interpretation. We also hold that substantial evidence supports the Secretary's finding that Baptist Memorial was not the operator of the educational activity. Accordingly, we affirm the judgment of the district court.

HEANEY, Circuit Judge, dissenting.

I concur in the majority's holding that the Secretary was entitled to limit pass-through reimbursement for clinical or classroom costs to those programs that were directly operated by the hospital. I respectfully dissent, however, from that portion of the opinion that holds that Baptist Health, through its subsidiary Baptist Memorial, does not qualify for such reimbursement.

Baptist Health is a single corporation. It owns and operates both Baptist Memorial and the Baptist School of Nursing. Baptist Memorial does not maintain its

own board of trustees or have separate corporate officers. It does not operate independently whatsoever; it is merely a wing of Baptist Health. Likewise, Baptist Health's board of trustees controls the operations of the nursing school, and Baptist Health holds the nursing school's license. Baptist Health has but one tax identification number, shared by all of its subsidiaries.

Given the above evidence, I cannot agree that Baptist Memorial is a separate entity from Baptist School of Nursing. Baptist Health owns both. In my view, the direct link between the two provided by their common ownership and operation qualifies Baptist Memorial as a direct provider of the nursing program. Indeed, the two subsidiaries appear to have believed as much: when Baptist Memorial agreed to host the nursing school's programs, it did so through a memorandum of agreement rather than a contract, since the signatories for each subsidiary would have been the same. Thus, although I agree that we accord the Secretary's findings deference, substantial evidence simply does not support the view that the nursing program was not provider operated.

_____

-17-