# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 11-2809

ABRAHAM LINCOLN MEMORIAL HOSPITAL, et al.,

*Plaintiffs-Appellants*,

*v.*

KATHLEEN SEBELIUS, Secretary of Health
and Human Services,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Central District of Illinois.
No. 3:10-CV-03122—**Sue E. Myerscough**, *Judge*.

ARGUED JANUARY 6, 2012—DECIDED OCTOBER 16, 2012

Before MANION and WILLIAMS, *Circuit Judges*, and
CASTILLO, *District Judge*.[*]

CASTILLO, *District Judge*. In a ruling constituting the
final administrative decision of the Secretary of the De-

---

[*] The Honorable Ruben Castillo, United States District Court
for the Northern District of Illinois, sitting by designation.

partment of Health and Human Services ("HHS"), the Administrator of the Centers for Medicare and Medicaid Services ("CMS") disallowed the reimbursement of Medicare expenses to a group of Illinois hospitals for their 2004 and 2005 cost years. Specifically, the Administrator found that the amount of a tax assessment paid by the hospitals pursuant to an Illinois statute was a reasonable cost, but was subject to offset by any payments those hospitals received from an Illinois State fund. Plaintiffs-appellants, nineteen hospitals ("Hospitals"),[1] appeal from the district court's decision upholding

---

[1] Appellants consist of the following nineteen hospitals: Abraham Lincoln Memorial Hospital; Blessing Hospital; Blessingcare Corporation, Inc., d/b/a Illini Community Hospital; Community Medical Center Of Western Illinois, Inc.; Gibson Community Hospital, d/b/a Gibson Area Hospital and Health Services; Hillsboro Area Hospital, Inc.; Hospital & Medical Foundation of Paris, Inc., d/b/a Paris Community Hospital; Kewanee Hospital; Memorial Hospital Association, Inc.; Memorial Medical Center; Mendota Community Hospital; Sarah Bush Lincoln Health Center; Shelby Memorial Hospital Association, Inc.; Southern Illinois Hospital Services, d/b/a Ferrell Hospital; Southern Illinois Hospital Services, d/b/a Herrin Hospital; Southern Illinois Hospital Services, d/b/a Saint Joseph Memorial Hospital; St. Joseph Hospital Of The Hospital Sisters Of The Third Order Of St. Francis; Taylorville Memorial Hospital; and Valley West Community Hospital. The following seven Appellants withdrew their appeals and were subsequently dismissed: Community Memorial Hospital; Hardin County General Hospital, Inc.; Hoopeston Community

(continued...)

the Administrator's decision. Because the Administrator's decision was not arbitrary or capricious and is supported by substantial evidence, we affirm the district court's well-reasoned and comprehensive opinion which granted summary judgment in favor of the Secretary.

## I. BACKGROUND

The issues presented in this appeal require an understanding of the complex and technical Medicare and Medicaid programs. As one of our sister circuits has commented, the statutes and provisions in question "are among the most completely impenetrable texts within human experience. Indeed, one approaches them at the level of specificity herein demanded with dread, for not only are they dense reading of the most tortuous kind, but Congress also revisits the area frequently, generously cutting and pruning in the process and making any solid grasp of the matters addressed merely a passing phase." *Rehab. Ass'n of Va. v. Kozlowski*, 42 F.3d 1444, 1450 (4th Cir. 1994). Accordingly, we begin with a detailed discussion of the Medicare and Medicaid programs and certain of the provisions that are relevant to this appeal.

---

[1] (...continued)

Memorial Hospital; Pana Community Hospital Association; Passavant Memorial Area Hospital Association; Richland Memorial Hospital, Inc.; and The Methodist Medical Center Of Illinois.

### A. Medicare

Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, known as the Medicare Act, "is a federally-subsidized health insurance program primarily for elderly and disabled individuals." *Michael Reese Hosp. and Med. Ctr. v. Thompson*, 427 F.3d 436, 438 (7th Cir. 2005). The Medicare Act divides benefits into four parts. The parties agree that this appeal concerns Part A of the program, which provides hospital insurance benefits for inpatient services, and Part B, which provides supplementary medical insurance benefits to cover, among other things, outpatient services. 42 U.S.C. §§ 1395c-1395i-5 (Part A); 42 U.S.C. §§ 1395j-1395w-5 (Part B).

Medicare "is administered, in part, through contractual arrangements with providers of health care services." *Adventist Living Ctrs. v. Bowen*, 881 F.2d 1417, 1419 (7th Cir. 1989) (citing 42 U.S.C. § 1395cc). Under the Medicare Act, health care providers are entitled to reimbursement for the "reasonable cost" of medical services they provide to Medicare beneficiaries. 42 U.S.C. § 1395f(b)(1); 42 C.F.R. § 413.9(a). To obtain reimbursement, health care providers submit cost reports at the end of their fiscal year to a fiscal intermediary, detailing the cost of services and amount of reimbursement a participating provider believes it is due. 42 C.F.R. §§ 413.20(b) and 413.24; *Little Co. of Mary Hosp. v. Sebelius*, 587 F.3d 849, 851 (7th Cir. 2009). The fiscal intermediary then reviews the cost reports, determines the amount of payments to be made to providers and issues a notice of program reimbursement. 42 C.F.R. § 405.1803;

*see also Little Co. of Mary Hosp.*, 587 F.3d at 851. A provider that is dissatisfied with the fiscal intermediary's decision may request a hearing by the Provider Reimbursement Review Board ("Board"), an administrative body appointed by the Secretary. 42 U.S.C. §§ 1395oo(a), (h); 42 C.F.R. § 405.1835. Once the Board issues a ruling, the Secretary may affirm, modify, or reverse that decision. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1871(b)(1). The Secretary has authorized the Administrator of CMS to act on her behalf in reviewing Board decisions. 42 C.F.R. § 405.1875. The Administrator's review of a Board decision is considered the final decision of the Secretary. *Id.* Providers who are unsatisfied with the Secretary's final decision may challenge the decision in federal district court. 42 U.S.C. § 1395(f).

Again, under the Medicare Act, participating health care providers are reimbursed for the "reasonable cost" of providing services to Medicare beneficiaries. 42 U.S.C. § 1395f(b)(1). "Reasonable costs" are defined as:

> the cost *actually incurred*, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services[.]

42 U.S.C. § 1395x(v)(1)(A) (emphasis added). This statutory definition, which explicitly requires the Secretary to reimburse providers for the costs they "actually in-

cur" reflects "the Medicare program's statutory policy of paying only for a provider's net costs." *Abbott-Northwestern Hosp., Inc. v. Schweiker*, 698 F.2d 336, 339 (8th Cir. 1983); *see also Mem'l Hosp. of Carbondale v. Heckler*, 760 F.2d 771, 781 (7th Cir. 1985) (noting that the income offset approach "clearly serves the purpose of the Medicare Act which limits reimbursement to costs actually incurred by the provider") (quoting *Cheshire Hosp. v. New Hampshire-Vermont Hospitalization Serv., Inc.*, 689 F.2d 1112, 1119 (1st Cir. 1982)).

Pursuant to her statutory authority, "[t]he Secretary has promulgated . . . regulations establishing the methods for determining reasonable cost reimbursement." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 92, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1993). Consistent with the statute, these regulations provide that "[a]ll payments to providers of services must be based on the reasonable cost of services covered under Medicare and related to the care of beneficiaries." 42 C.F.R. § 413.9(a). Reasonable costs are defined as those "necessary and proper costs incurred in furnishing services[.]" *Id.* As relevant here, the regulations address some situations where a health care provider must account for the receipt of any refunds, rebates, credits, or discounts by offsetting or reducing the costs to which they relate so as to appropriately reflect the costs actually incurred. Specifically, the regulations provide that "refunds of previous expense payments are reductions of the related expense." 42 C.F.R. § 413.98(a). Refunds are defined as "amounts paid back *or* a credit allowed on account of an overcollection." 42 C.F.R. § 413.98(b)(3)

(emphasis added). The regulations further clarify that the true cost of goods or services "is the net amount actually paid for them" and that "refunds of previous expense payments are clearly reductions in costs and must be reflected in the determination of allowable costs." 42 C.F.R. § 413.98(d).

In addition to the regulations, the Secretary also publishes the Provider Reimbursement Manual ("Manual") which provides guidance in interpreting the regulations. *Mem'l Hosp. of Carbondale*, 760 F.2d at 772; *Guernsey Mem'l Hosp.*, 514 U.S. at 101-02, 115 S.Ct. 1232 (referring to the Manual provisions as interpretive rules). While the Manual "is entitled to 'considerable deference' as a general matter[,]" *Daviess Cnty. Hosp. v. Bowen*, 811 F.2d 338, 345 (7th Cir. 1987) (citing *Bedford Med. Ctr. v. Heckler*, 766 F.2d 321, 323 (7th Cir. 1985)), it is not strictly binding on the Secretary and "we will uphold a decision despite certain variations from the [M]anual." *Paragon Health Network, Inc. v. Thompson*, 251 F.3d 1141, 1147 (7th Cir. 2001).

At the time the Hospitals submitted their cost reports to the Intermediary, the Manual provided that "[t]he general rule is that taxes assessed against the provider . . . are allowable costs." Manual § 2122.1 (Rev. 205).[2] The Manual also provides a list of taxes that are not

---

[2] The Manual currently provides that, as a general rule, "taxes assessed against the provider . . . are allowable costs to the extent they are actually incurred and related to the care of beneficiaries." Manual § 2122.1 (Rev. 448).

allowable as costs, such as sales taxes or taxes on property that are not used in rendering covered services. Manual § 2122.2 (Rev. 215).[3] Notably, health care provider taxes were not, and are not currently included, among the list of taxes that are not allowed.

Consistent with the regulations, the Manual provides that "refunds of previous expense payments are reductions of the related expense." Manual § 800 (Rev. 450). The Manual further instructs that "[d]iscounts, allowances, refunds, and rebates . . . should be used to reduce the specific costs to which they apply[.]" Manual § 804 (Rev. 45).[4] The Manual defines refunds as "amounts paid back by the vendor generally in recognition of damaged shipments, overpayments, or returned purchases." Manual § 802.31 (Rev. 450). The Manual also defines "Applicable Credits" as "[t]hose receipts or types of transactions which offset or reduce expense items that are allocable to cost centers as direct or indirect costs.

---

[3]  The Manual currently indicates that the list is not exhaustive. Manual § 2122.2 (Rev. 448) ("These taxes include:"). At the time the Hospitals submitted their cost reports to the Intermediary, however, the Manual read as follows: "These taxes are[.]" Manual § 2122.2 (Rev. 215) (emphasis added).

[4]  In December 2011, CMS clarified the language of § 804 to read: "Discounts, allowances, refunds, and rebates are not to be considered a form of income but rather a reduction of the specific costs to which they apply in the accounting period in which the purchase occurs. The true cost of goods and services is the net amount actually paid for the goods or services." Manual § 804 (Rev. 450).

Typical examples of such transactions are: purchase discounts, rebates, or allowances; recoveries or indemnities on losses; sales of scrap or incidental services; adjustments of overpayments or erroneous charges; and other income items which serve to reduce costs." Manual § 2302.5 (Rev. 336).

### B. Medicaid

Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, known as the Medicaid Act, "is a cooperative federal-state program that provides federal funding for state medical services to the poor." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 433, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004). Medicaid is jointly financed by the Federal and State Governments, but is administered by the States. 42 C.F.R. § 430.0. While participation is voluntary, once a State elects to participate, it must comply with requirements imposed by the Medicaid Act and regulations promulgated by the Secretary. *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). One such requirement is that every participating State must submit a State plan, i.e., a Medicaid Plan, to CMS describing the nature and scope of its Medicaid program and affirming that it will be administered in conformity with Title XIX's requirements. 42 U.S.C. § 1396a(a); 42 C.F.R. §§ 430.10 and 430.12(b). Any proposed amendments to a State plan must also be submitted to CMS for approval. 42 C.F.R. § 430.12(c).

Where a State establishes a State plan that satisfies the requirements of Title XIX, the Federal Government shares

in the cost by reimbursing a participating State for patient care costs on the basis of a federal medical assistance percentage ("FMAP"). 42 U.S.C. § 1396b(a)(1); 42 C.F.R. § 433.10(b); *Harris v. McRae*, 448 U.S. 297, 308, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). The FMAPs are used in determining the amount of federal matching funds, known as federal financial participation ("FFP"), participating States receive. The federal government typically pays between 50% and 83% of the costs incurred by the participating State for patient care. 42 C.F.R. § 433.10(b).

Prior to 1991, States "began to take advantage of a 'loophole' in the Medicaid program that allowed states to gain extra federal matching funds without spending more state money." *Protestant Mem'l Med. Ctr., Inc. v. Maram*, 471 F.3d 724, 726 (7th Cir. 2006). Specifically, States would make payments to hospitals, collect the federal matching funds, and then recover a portion of the payments made to hospitals through the collection of a health care related tax imposed on the hospitals. *See generally id.* (discussing loophole). Under these arrangements, States essentially raised revenue for their Medicaid programs while shifting program costs away from themselves and to the Federal Government.

In 1991, Congress enacted the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991 ("1991 Amendments"), Pub. L. No. 102-234 § 2, 105 Stat. 1793, 1793-99 (effective Jan. 1, 1992) (codified at 42 U.S.C. § 1396b(w)). In the 1991 Amendments, Congress instructed that the amount of federal matching funds provided to a State should be reduced by the

amount of any revenues received by the State through a health care related tax that was not broad-based and that contained a hold harmless provision. 42 U.S.C. § 1396b(w)(1)(A)(ii)-(iii); *see also Protestant Mem'l Med. Ctr., Inc.*, 471 F.3d at 726. Thus, where a health care related tax is broad-based and does not contain a hold harmless provision, a State does not lose any matching federal contributions.

"A health care related tax is either a tax that treats providers or purchasers of health care items or services differently from other individuals on whom the tax falls, or it is a tax in which at least eighty-five percent of the tax burden falls on those who provide or purchase health care items or services." *Protestant Mem'l Med. Ctr., Inc.*, 471 F.3d at 726 (citing 42 U.S.C. § 1396b(w)(3)(A)). "A health care related tax contains a 'hold harmless provision' when it provides some sort of payment to the taxpayer that is tied to the amount of the health [care] related tax paid." *Id.* (citing 42 U.S.C. § 1396b(w)(4)). For instance, where a health care related tax "provides a direct [or indirect] payment to the taxpayer based on either the amount of the tax paid or the difference between the amount of the tax paid and the amount the taxpayer receives as payments under the State's Medicaid plan," that constitutes a hold harmless provision. *Id.* (citing 42 U.S.C. § 1396b(w)(4)(A)); 42 C.F.R. § 433.58(f)(1). Additionally, hold harmless provisions are found where a health care related tax provides that "payments that the taxpayer receives under the state's Medicaid program are tied to the total health care related tax paid." *Id.* (citing 42 U.S.C. § 1396b(w)(4)(B));

42 C.F.R. § 433.68(f)(2). "Lastly, if the state promises to hold the taxpayer harmless for a portion of the cost of the tax through a direct payment or exemption from the tax, that promise also constitutes a 'hold harmless provision.'" *Id.* (citing 42 U.S.C. § 1396b(w)(4)(C)); 42 C.F.R. § 433.68(f)(3).

**C.  Illinois' Hospital Provider Funding Legislation**

In 2004, Illinois enacted Hospital Provider Funding Legislation ("Legislation") imposing a tax ("Tax Assessment") on hospital providers, except for certain categories of exempt hospitals, for fiscal years 2004 and 2005. 305 Ill. Comp. Stat. 5/5A-2(a) (2004); 305 Ill. Comp. Stat. 5/5A-3(b) (2004) (listing exempt hospitals); *Protestant Mem'l Med. Ctr., Inc.*, 471 F.3d at 727. The Tax Assessment was equal to $84.19 for each "occupied bed day," meaning the total number of days that each hospital bed was occupied by a patient during calendar year 2001. 305 Ill. Comp. Stat. 5/5A-2(a) (2004); *see also Protestant Mem'l Med. Ctr., Inc.*, 471 F.3d at 727.

The Illinois Department of Public Aid (now known as the Illinois Department of Healthcare and Family Services) ("Department"), was charged with the responsibility of collecting the Tax Assessments, along with administering and enforcing the Legislation. 305 Ill. Comp. Stat. 5/5A-7 (2004); *Protestant Mem'l Med. Ctr., Inc.*, 471 F.3d at 725-26. The Department was required to deposit all Tax Assessment moneys received from hospitals into a Hospital Provider Fund ("Fund"). 305 Ill. Comp. Stat. 5/5A-6 (2004). In addition to the Tax Assessment moneys,

the Fund consisted of: (1) all federal matching funds received by the Department as a result of expenditures it made that were attributable to money deposited in the Fund; (2) interest and penalties levied in conjunction with the statute; (3) money transferred from another fund in the State treasury; and (4) any other money received for the Fund from any other source, including earned interest. 305 Ill. Comp. Stat. 5/5A-8(c) (2004).

Pursuant to Section 5A-12 of the Legislation, the Department was required to make hospital access improvement payments ("Access Payments") to non-exempt hospitals with money from the Fund. 305 Ill. Comp. Stat. 5/5A-12(a) (2004). The Access Payments were additional Medicaid payments. *See Protestant Mem'l Med. Ctr., Inc.*, 471 F.3d at 727 (noting that the Access Payments "provided payments to hospitals above the basic rate for inpatient hospital services, including a 'Medicaid inpatient utilization rate adjustment'" and citing 305 Ill. Comp. Stat. 5/5A-12). In addition to disbursements for Access Payments, the Legislation permitted the Department to disburse money from the Fund for a number of other reasons, including for payment of administrative expenses incurred by the Department in performing activities under the Legislation and for transfers to the State's Medicaid Trust Fund or other State funds. 305 Ill. Comp. Stat. 5/5A-8(b) (2004) (listing eight reasons for disbursements from the Fund).

The Access Payments were "not due and payable" until: (1) approval by the Federal Government in a State plan amendment; (2) a determination was made that the Tax

Assessment was a permissible tax under Medicaid; and (3) the Tax Assessment took effect. 305 Ill. Comp. Stat. 5/5A-12(a) (2004). For fiscal year 2004, the Access Payments were to be made on or before June 15, 2004. *Id*. As to the Tax Assessments for fiscal year 2004, they were due on June 18, 2004. 305 Ill. Comp. Stat. 5/5A-4(a) (2004). For fiscal year 2005, the Access Payments were to be made in four installments on or before July 15, 2004, October 15, 2004, January 14, 2005, and April 15, 2005. 305 Ill. Comp. Stat. 5/5A-12(a) (2004). The Tax Assessments for fiscal year 2005 were required to be paid in four installments and were due on July 19, 2004, October 19, 2004, January 18, 2005, and April 19, 2005. 305 Ill. Comp. Stat. 5/5A-4(a) (2004). Importantly, a hospital's payment of the Tax Assessment was contingent upon: (1) actual receipt of the Access Payments; (2) approval by CMS of the Access Payments under Section 5A-12; and (3) CMS's waiver of Medicaid's broad-based requirement for health care related taxes as it pertained to the Tax Assessment. 305 Ill. Comp. Stat. 5/5A-4(a) (2004).

In the event the Access Payments were not eligible for federal matching funds under Medicaid, the Legislation provided that the Tax Assessment "shall not take effect or shall cease to be imposed, and any moneys remaining in the Fund shall be refunded to hospital providers[.]" 305 Ill. Comp. Stat. 5/5A-10(a)(3) (2004). Furthermore, if the Tax Assessment was determined to be an impermissible tax under Medicaid, the Tax Assessment "[would] not take effect or [would] cease to be imposed[.]" 305 Ill. Comp. Stat. 5/5A-10(b) (2004).

### D.  State Plan Amendments to Illinois' Medicaid Plan

In 2004, Illinois submitted two State plan amendment ("SPA") requests to CMS for approval of adjustments to the payment methodologies for inpatient and outpatient hospital services. Illinois also requested that CMS grant a waiver of the broad-based requirement for the Tax Assessment under 42 C.F.R. § 433.68(e)(1).[5] Illinois requested the waiver because some hospitals were exempt from paying the Tax Assessment. Upon review of the proposed SPAs, CMS noted that the proposed SPAs conditioned payment on approval of the waiver request and requested that Illinois remove this conditional language. Illinois removed the conditional language from the proposed SPAs, although the language of the Legislation remained intact. CMS then approved the SPAs and granted the waiver request.

### E.  The Administrator's Decision

During fiscal years 2005 and 2006, the Hospitals sought reimbursement for services provided to Medicare patients on a reasonable cost basis. *See* 42 U.S.C. § 1395f(b)(1). In their cost reports, the Hospitals included the Tax Assess-

[5] Pursuant to Medicaid regulations, permissible health care related taxes must be broad-based, uniformly imposed, and may not violate the hold harmless provisions of the regulations. 42 C.F.R. § 433.68(b). States may nonetheless request a waiver from CMS of the broad-based requirement. 42 C.F.R. § 433.68(c)(3).

ments they paid as a reasonable cost to be reimbursed under Medicare. The fiscal intermediary ("Intermediary") disallowed the Tax Assessment payments as costs and made audit adjustments reducing the Hospitals' Medicare reimbursement by all or a portion of the Access Payments the Hospitals received. The Hospitals appealed the Intermediary's decisions to the Board, which consolidated the appeals into one group appeal. The Board reversed the Intermediary's decisions, holding that the Tax Assessment was an allowable cost under Medicare and further concluding that the Tax Assessment was a permissible tax under Medicaid and that the Access Payments were not a refund of the Tax Assessment.

The Intermediary sought review of the Board's decision, and the CMS Administrator reversed. The Administrator held that although the Tax Assessment was an allowable tax, the Access Payments were properly treated as refunds of the Tax Assessment. The Administrator reasoned that the statutory language of the Legislation evinced a link between the Tax Assessments and the Access Payments. The Administrator therefore concluded that the Tax Assessment payments were properly offset against the amount of Access Payments each of the Hospitals received, such that the allowable tax was properly calculated as the amount of the Tax Assessment less the amount refunded by Illinois in the form of Access Payments. The Administrator further concluded that whether the Tax Assessment met Medicaid's hold harmless provision was not pertinent to whether the refund should be offset under Medicare principles to determine the amount of necessary and reasonable tax expenses.

The Hospitals then brought suit in the Central District of Illinois, contending that the Administrator's decision violated the Administrative Procedure Act ("APA"). In a thorough and detailed opinion granting summary judgment to the Secretary and denying summary judgment to the Hospitals, Judge Myerscough upheld the Administrator's decision, finding that the Secretary's interpretation of the Medicare statutes and regulations "was not arbitrary, capricious, or contrary to law, and is supported by substantial evidence." *Abraham Lincoln Mem'l Hosp. v. Sebelius*, No. 10-3122, 2011 WL 2293233, at *7-*10 (C.D. Ill. June 8, 2011).

## II. DISCUSSION

We review the district court's decision denying the Hospitals' motion for summary judgment and granting summary judgment to the Secretary *de novo*. *Mt. Sinai Hosp. Med. Ctr. v. Shalala*, 196 F.3d 703, 707 (7th Cir. 1999). At the outset, however, we note that our review of the Secretary's decision is limited. *Loyola Univ. of Chi. v. Bowen*, 905 F.2d 1061, 1066 (7th Cir. 1990). Our review of the Secretary's decision on reimbursement matters is governed by 42 U.S.C. § 1395oo(f)(1), which incorporates the standard of review from the APA. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); *Hinsdale Hosp. Corp. v. Shalala*, 50 F.3d 1395, 1399 (7th Cir. 1995). The APA commands reviewing courts to "hold unlawful and set aside" agency action where it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . [or]

unsupported by substantial evidence . . . ." 5 U.S.C. § 706(2); *Hinsdale Hosp. Corp.*, 50 F.3d at 1399; *Thomas Jefferson Univ.*, 512 U.S. at 512, 114 S.Ct. 2381. Under both the "arbitrary and capricious" and "substantial evidence" standards, the scope of review is narrow and a court must not substitute its judgment for that of the agency. *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.E.2d 443 (1983).

To the extent the Secretary's decision is based on an interpretation of the statutory language, the Court owes *Chevron* deference. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) [hereinafter *Chevron*]. Under *Chevron*, courts engage in a two-step inquiry. First, we must determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. 2778. Where Congress' intent is clear, we must give effect to Congress' unambiguously expressed intent. *Id.* at 842-43, 104 S.Ct. 2778. Where the statute is silent or ambiguous, however, we must examine "whether the agency's [interpretation] is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778.

When the construction of an administrative regulation is at issue, it is well-established that the Secretary's interpretation of her own regulations is entitled to substantial deference. *Thomas Jefferson Univ.*, 512 U.S. at 512, 114 S.Ct. 2381. "Our task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Id.* (internal citations

and quotation marks omitted). This substantial degree of deference is "particularly warranted when, as here, the Secretary is interpreting regulations 'issued pursuant to the complex and reticulated Medicare Act[.]'" *Hinsdale Hosp. Corp.*, 50 F.3d at 1399 (quoting *Adventist Living Ctrs.*, 881 F.2d at 1420-21); *see also Thomas Jefferson Univ.*, 512 U.S. at 512, 114 S.Ct. 2381.

The Medicare Act "gives the Secretary wide latitude in developing methods of determining costs." *St. Mary's Hosp. Med. Ctr. v. Heckler*, 753 F.2d 1362, 1367 (7th Cir. 1985) (citing 42 U.S.C. § 1395x(v)(1)(A)). That said, the "Medicare statute specifically circumscribes the Secretary's discretion to define reasonable cost." *Little Co. of Mary Hosp.*, 587 F.3d at 853 (quotation marks omitted) (citing *St. James Hosp. v. Heckler*, 760 F.2d 1460 (7th Cir. 1985); *St. Francis Hosp. Ctr. v. Heckler*, 714 F.2d 872 (7th Cir. 1983); *Northwest Hosp., Inc. v. Hosp. Serv. Corp.*, 687 F.2d 985 (7th Cir. 1982); *St. John's Hickey Mem'l Hosp., Inc. v. Califano*, 599 F.2d 803 (7th Cir. 1979)). More specifically, the Medicare Act directs that the regulations shall "take into account both direct and indirect costs," so that, under the methods of determining costs, the costs of providing services to Medicare patients is not borne by non-Medicare patients, and vice versa. 42 U.S.C. § 1395x(v)(1)(A); *see also St. John's Hickey Mem'l Hosp., Inc.*, 599 F.2d at 813 n.17 (regulations must . . . take into account both direct and indirect costs and must avoid shifting costs to non-Medicare patients); *see also Loyola Univ. of Chi.*, 905 F.2d at 1067.

Finally, "[t]he fact that the [Board] and the Secretary may have reached different conclusions does not

diminish the deference due the Secretary's final decision: '[f]inal responsibility for rendering decisions rests with the agency itself, not with subordinate hearing officers.'" *Adventist Living Ctrs.*, 881 F.2d at 1421 (quoting *St. Francis Hosp. Ctr.*, 714 F.2d at 874).

The Hospitals urge us to reverse the Secretary's final decision on the basis of five separate arguments. First, the Hospitals contend that the Administrator's decision ("Decision") is arbitrary and capricious, contrary to law, and not supported by substantial evidence because the Administrator misapplied the regulatory term "refund" in concluding that the Access Payments constituted a refund of the Tax Assessments. Second, the Hospitals argue that the Decision misapplied Medicare's statutory standard as to whether the Tax Assessment costs were "actually incurred." Third, the Hospitals urge us to set aside the Decision on the basis that CMS previously determined that the Access Payments did not constitute refunds. Fourth, the Hospitals argue that the Decision must be set aside as an arbitrary and capricious reversal of long-standing policy. Finally, the Hospitals stress that the Decision must be set aside because it establishes a new rule that fails to comply with the APA. We address each argument in turn.

### A. The Administrator's Decision did not misapply the regulatory definition of the term "refund" and was supported by substantial evidence

The Hospitals first argue that the Decision, finding that the Access Payments to the Hospitals were inextricably

linked to the Tax Assessments and constituted a refund, is contrary to law, arbitrary and capricious, and not supported by substantial evidence. According to the Hospitals, the Decision misapplied the regulatory definition of the term "refund" and ignored facts in the record showing no link between the Tax Assessments the Hospitals paid and the Access Payments they received.

### 1. Whether the Administrator misapplied the regulatory definition of the term "refund"

We find that the Administrator's Decision to treat the Access Payments as refunds and therefore offset the Access Payments against the Tax Assessments is in keeping with the statutory and regulatory directives and is not arbitrary, capricious, or contrary to law. Under the Medicare Act, health care providers may only be reimbursed for their "reasonable costs," 42 U.S.C. § 1395f(b)(1), meaning those costs that are "actually incurred." 42 U.S.C. § 1395x(v)(1)(A). Consistent with this statutory directive, the corresponding regulations and Manual provisions require that a health care provider's costs be offset to account for the receipt of refunds, rebates, credits, or other discounts by offsetting the costs to which they relate. 42 C.F.R. § 413.98; Manual § 804 (Rev. 45). Pursuant to the Secretary's regulations, refunds of previous expense payments are to be treated as reductions of the related expense. 42 C.F.R. § 413.98(a); Manual § 800 (Rev. 450).

A plain reading of the Legislation evidences that the Access Payments clearly served to reduce related

expenses, i.e., the Tax Assessments, and therefore were appropriately offset against the Tax Assessments. Pursuant to the terms of the Legislation, the full Tax Assessment was not an incurred cost as the Illinois statute made clear that no installment of the Tax Assessment was "due and payable" until the Hospitals actually received the Access Payments. 305 Ill. Comp. Stat. 5/5A-4(a)(ii) (2004). So, for fiscal year 2004, Access Payments were to be made on or before June 15, 2004, and the Tax Assessment was due three days later on June 18, 2004. 305 Ill. Comp. Stat. 5/5A-12(a) (2004); 305 Ill. Comp. Stat. 5/5A-4(a) (2004). Similarly, for fiscal year 2005, Access Payments were to be made in four installments on or before July 15, 2004, October 15, 2004, January 14, 2005, and April 15, 2005, yet the Tax Assessments were not due until July 19, 2004, October 19, 2004, January 18, 2005, and April 19, 2005. 305 Ill. Comp. Stat. 5/5A-12(a) (2004); 305 Ill. Comp. Stat. 5/5A-4(a) (2004). The Legislation further provided that the Access Payments were "not due and payable" until the Tax Assessment took effect, 305 Ill. Comp. Stat. 5/5A-12(a) (2004), and in the event the Access Payments were not eligible for federal matching funds under Medicaid, the Tax Assessment would not take effect and any money in the Fund would be refunded to the Hospitals. 305 Ill. Comp. Stat. 5/5A-10(a)(3) (2004). In other words, if the Federal Government declined to provide the State with federal matching funds for the Access Payments, any Tax Assessment moneys collected would be returned to the Hospitals. The plain language of the Legislation shows a clear relationship between the Access Payments and the Tax Assess-

ments. To simply ignore the Access Payments, while recognizing the Tax Assessments in full in determining the Hospitals' reimbursable costs, as the Hospitals essentially request, would violate the statutory and regulatory directives that health care providers should be reimbursed only for the costs they have actually incurred, i.e., their net costs. This is especially so where the Tax Assessment moneys were deposited into the same Fund from which the Access Payments were disbursed.

Nonetheless, the Hospitals contend that the Access Payments were not computed based on the amount of the Tax Assessment the Hospitals paid and therefore the Access Payments could not possibly have constituted a "refund" of the Tax Assessments. According to the Hospitals, the Access Payments do not fit within the technical definition of a refund, which is defined as an "amount[ ] paid back or a credit allowed on account of an overcollection." 42 C.F.R. § 413.98(b)(3). By the Hospitals' logic, however, any amount of money that they might pay out, but which is then returned to them for any reason and is not directly calculated off of the amount of money they paid is not subject to an offset. To borrow an example from the Fifth Circuit, this is akin to arguing that if a thermometer manufacturer sold the Hospitals a thermometer for $100 and then, pursuant to a separate agreement, voluntarily gave the Hospitals $75 of that money back, the Hospitals would be able to be reimbursed $100 by the Medicare program, without any offset, because the $75 was not directly computed off of the $100 purchase price. *Sta-Home Health Agency, Inc. v. Shalala*, 34 F.3d 305, 309-10 (5th Cir. 1994) (rejecting

similar argument raised by provider that certain em-
ployee salary contributions "were not refunds because
they were not paid back 'on account of an overcollec-
tion'"). As in *Sta-Home Health Agency*, the guiding
principle is the statutory and regulatory language,
which instructs that reimbursement is allowed only for
costs "actually incurred," such that refunds must be
accounted for when determining the amount of reim-
bursable expenses. 34 F.3d at 310. We find that the Secre-
tary's interpretation of the regulations and Manual pro-
visions pertaining to "refunds", which are intended to
guide her interpretation of what costs are actually in-
curred, was not plainly erroneous or inconsistent, and
therefore the Administrator's Decision was not arbitrary,
capricious, or contrary to law.

### 2. Whether there is substantial evidence to sup-
### port the Administrator's Decision

Despite the Legislation's language to the contrary,
the Hospitals also argue that the Decision is not sup-
ported by substantial evidence in that it ignored facts
in the record showing no link between the Tax Assess-
ments and the Access Payments the Hospitals received.
"Substantial evidence is 'such relevant evidence as a
reasonable mind might accept as adequate to support
a conclusion.'" *Loyola Univ. of Chi.*, 905 F.2d at 1066-67
(quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct.
1420, 1427, 28 L.Ed.2d 842 (1971)).

In concluding that the Access Payments were properly
treated as refunds of the Tax Assessments and should
be offset against the Tax Assessments because they

were inextricably linked, the Administrator relied on the language of the Legislation, communications between providers and the State, and the timing of the Tax Assessments and the Access Payments. Specifically, the Administrator took into account the fact that health care providers did not have to pay any portion of the Tax Assessment until the Access Payments were received, letters from the State to providers informing them of the date they should expect to receive the Access Payments and the dates their Tax Assessment was due, as well as the sheer timing of the Access Payments and the Tax Assessments. The fact that the Access Payments were integrally related to the Tax Assessments was not a mystery to the Administrator, who recognized that "but for the [T]ax [A]ssessment there would have been no Fund payment and likewise without the Fund payment there would have been no [T]ax [A]ssessment."

According to the Hospitals, the Administrator placed undue weight on the "superficial timing issue" while ignoring other facts in the record. For instance, they contend that Illinois removed conditional language from the SPAs during the SPA review process, thereby making it clear that the Access Payments would be made regardless of whether CMS found the Tax Assessment permissible. While it is true that Illinois removed the conditional language from the SPAs, the Hospitals ignore the fact that the State did not remove such language from the Legislation which continued to make clear that the Access Payments were "not due and payable" until the Tax Assessment took effect, among other requirements. 305 Ill. Comp. Stat. 5/5A-12(a)(1) (2004). If the Tax Assessment failed to take effect, Illinois was not

obligated to make the Access Payments to the Hospitals per the terms of the Legislation.

The Hospitals also ignore the language in the Legislation making it clear that the Hospitals did not need to pay the Tax Assessment until after they received the Access Payments. According to the Hospitals, this should be disregarded as a mere "superficial timing" issue. We disagree, in light of the fact that any Tax Assessment moneys would be refunded to the Hospitals if the State did not receive federal matching funds for the Access Payments. Finally, the Hospitals also ignore the fact that the Access Payments were disbursed out of the same Fund that the Tax Assessment moneys were paid into. Because the Administrator's decision is supported by substantial evidence, we decline to reverse it.

### B. The Administrator's Decision applied the correct statutory standard requiring that allowable costs must be "actually incurred"

The Hospitals' second contention on appeal is that the Decision failed to apply the correct statutory standard that costs must be "actually incurred" in determining the allowability of the Tax Assessment, and incorrectly determined that the Hospitals did not actually incur the cost of the Tax Assessment. The Secretary counters that the term costs "actually incurred" found in the Medicare Act, requires her to assess costs "as they are." According to the Secretary, this necessarily includes accounting for offsets for anything that defrays part of the nominal costs health care providers pay.

### 1. Whether the Decision applied the wrong statutory standard

The Hospitals assert that the Decision hinges on the premise that because the Access Payments were "inextricably linked" to the Tax Assessments, the Access Payments must be offset against the cost of the Tax Assessments when determining the amount of a health care provider's reimbursable costs. According to the Hospitals, the Administrator's use of a "linkage" concept was inappropriate and under the statutory language of the Medicare Act, the correct standard is whether the costs were "actually incurred." Relying on *Charlotte Memorial Hospital v. Bowen*, 860 F.2d 595, 598 (4th Cir. 1988), the Hospitals argue that a cost is "actually incurred" when a provider's liability accrues, regardless of when the liability is paid.

Again, under the Medicare Act, health care providers are reimbursed for their reasonable costs. 42 U.S.C. § 1395f(b)(1). The Medicare Act defines reasonable costs as the costs "actually incurred" and directs the Secretary to promulgate regulations establishing the methods to be used, and items to be included, in determining such costs. 42 U.S.C. § 1395x(v)(1)(A). Pursuant to her statutory authority, the Secretary has promulgated regulations and rules to clarify that in determining the actual cost of goods, the true cost is the net amount actually paid for them, such that discounts, allowances, refunds, and credits must be reflected in the determination of allowable costs. 42 C.F.R. § 413.98. Accordingly, the regulations and related Manual provi-

sions employ a net cost approach for determining the amount of reimbursable expenses and provide that refunds are reductions, or offsets, of a related expense. 42 C.F.R. § 413.98(a); Manual § 800 (Rev. 450). The Manual provisions pertaining to applicable credits also employ this same net cost approach. "Applicable Credits" are defined in the Manual as those "types of transactions which offset or reduce expense items" and examples of such transactions generally include "income items which serve to reduce costs." Manual § 2302.5 (Rev. 336).

Here, the Administrator did not manufacture a " 'linkage' standard out of whole cloth" as the Hospitals assert. Rather, in determining the costs actually incurred, the Administrator looked at the economic impact of the Hospitals' receipt of the Access Payments to determine the Hospitals' net Tax Assessment costs. In so doing, the Administrator assessed whether the Access Payments served to reduce a related expense, such that they constituted a refund of the Tax Assessments, and concluded that the Access Payments were indeed intended to reduce the cost of the Tax Assessment. The Hospitals' reliance on *Charlotte Memorial Hospital* is unavailing, as the question presented there was *when* a hospital incurred a reimbursable cost for services and not *whether* a hospital's costs should be offset. 860 F.2d at 598.[6] Accord-

---

[6] The Hospitals also argue that the Tax Assessments paid by the Hospitals are not different from other kinds of allowable

(continued...)

ingly, we find that the Secretary's construction of costs "actually incurred" is based upon a reasonable interpretation of the statutory term and was not arbitrary, capricious, or contrary to law.

### 2. Whether the Tax Assessment costs were "actually incurred"

The Hospitals also argue that they incurred the full cost of the Tax Assessment, as they were billed by the State of Illinois for the Tax Assessment and they wrote checks to the State to pay for the Tax Assessment. Therefore, they contend, the Administrator's Decision that they did not actually incur the cost of the Tax Assessment is incorrect, as the statutory language requires that they be reimbursed for the reasonable costs they actually incurred.[7]

---

(...continued)

taxes that are paid into a State's general revenue fund and used to fund Medicaid payments. According to them, CMS has previously determined that health care related taxes "may be considered an allowable cost for purposes of developing *Medicaid* reimbursement rates' for hospitals, without any requirement that the Medicaid payments received be offset against the amount of the tax." The problem with this argument, however, is that we are concerned here with Medicare reimbursement and not with whether taxes should be offset for purposes of determining Medicaid reimbursement.

[7] The Hospitals contend that the word "incurred' does not involve a highly technical Medicare regulation requiring

(continued...)

While the Hospitals are correct that the Secretary must assess the costs "actually incurred," their argument does not recognize that the Secretary's regulations require that reimbursable costs must necessarily take into account any amounts that defray a health care provider's costs. 42 C.F.R. §§ 413.5(c), 413.98. In determining allowable costs, the Secretary should not look at costs in a vacuum, but must look at the totality of the circumstances. The Hospitals' argument ignores the real net economic impact of the Access Payments.

The Hospitals also assert that CMS's position that the Hospitals did not "actually incur" the costs of the Tax Assessment within the meaning of 42 U.S.C. § 1395x(v)(1)(A) "runs counter to the intent of Congress, reflected in 42 U.S.C. § 1396b(w)(4), that permissible provider tax arrangements, such as the one at issue in this case, shall not be a basis to deny reimbursement." The fundamental error with the Hospitals' argument, however, is that the Hospitals cite to the Medicaid statute to show Congress's intent as it relates to reimbursable expenses under Medicare. While the Medicaid provision the Hospitals rely upon ensures that States are properly reimbursed for patient care costs under Medicaid, it does not address whether a health care

---

(...continued)

CMS's expertise, and therefore the Decision is not entitled to any deference. Under *Chevron*, however, we must give effect to an agency's regulation containing a reasonable interpretation of an ambiguous statutory term. 467 U.S. at 843, 104 S.Ct. 2778.

provider incurs an allowable cost under Medicare. The Hospitals' reliance on HHS's position that permissible tax arrangements under § 1396b(w)—a Medicaid provision—somehow demonstrates that "the funds received by the providers are 'protected reimbursement for cost of *Medicaid* services,'" Medicaid Program; Health Care-Related Taxes, 73 Fed. Reg. 9685, 9690-91 (Feb. 22, 2008) (emphasis added), also suffers from the same error. In short, the Hospitals' arguments fail to address the key differences between Medicaid and Medicare.

## C. Significance of CMS's determination that the Access Payments were not a hold harmless arrangement

The Hospitals' third contention on appeal is that the Decision must be set aside in light of CMS's approval of the SPAs. The Hospitals argue that CMS's approval of the SPAs demonstrates that CMS previously determined that the Access Payments and Tax Assessment did not constitute a hold harmless arrangement. According to the Hospitals, "[t]he nature of the Medicaid payments to the Hospitals—already determined by CMS not to be a repayment of the provider tax but, rather, needed payments for services to Medicaid patients—does not change when the Medicare program confronts those facts." In support, the Hospitals rely on *Michael Reese Physicians and Services, S.C. v. Quern*, 606 F.2d 732, 736-37 (7th Cir. 2002). There, however, we stated that in approving the Illinois Medicaid plan, HHS had determined that the State plan was in compliance with Medicaid's

statutory and regulatory requirements. Nowhere in *Michael Reese Physicians and Services* did we note that HHS's determinations as they pertained to Medicaid, were controlling on HHS's Medicare determinations.

The Hospitals also fail to point to any statutory language in the Medicare Act suggesting that an interpretation of the Medicaid Act is controlling when interpreting provisions of the Medicare Act. While both Medicare and Medicaid are federally sponsored programs, they are two entirely distinct programs with fundamentally different rules governing eligibility for federal funds. *Univ. of Wash. Med. Ctr. v. Sebelius*, 634 F.3d 1029, 1031 (9th Cir. 2011) (explaining the different funding mechanisms). Most notably, Medicare is a federally funded program whereas Medicaid is jointly financed by the States and the Federal Government with precise rules for determining the amount of federal matching funds a participating State will receive. Because the two programs are independent of one another, CMS's decisions with respect to a State's Medicaid program are not controlling on how CMS interprets the application of Medicare provisions. *See Cmty. Health Ctr. v. Wilson-Coker*, 311 F.3d 132, 137 (2d Cir. 2002) (finding that Secretary's definition of "'reasonable' or 'reasonably related' under Medicare" need not have the same meaning that those terms have for Medicaid purposes); *Roe v. Norton*, 522 F.3d 928, 933 n.5 (2d Cir. 1975) (assuming that Medicare has a "medical necessity" requirement, courts should not infer that Medicaid has an analogous requirement).

The Hospitals further argue that the purpose of the hold harmless provision in the Medicaid statute is the same as the purpose of the reasonable cost provision in the Medicare statute, which is to ensure that CMS only reimburses an entity for the costs it has actually incurred and therefore the two provisions should not be interpreted inconsistently. According to them, by prohibiting, in the Medicaid context, the payment of federal matching funds in those circumstances where a State refunds taxes back to the providers that originally paid them, the Medicaid Act was essentially employing the same payment restriction as found in the Medicare regulations and Manual provisions pertaining to refunds. The Hospitals contend that by disregarding the fact that CMS approved the SPAs, thereby concluding that the Access Payments did not constitute a refund of the Tax Assessment, the Decision interpreted the Medicaid and Medicare Acts inconsistently. In support, the Hospitals rely on *Adena Regional Medical Center v. Leavitt*, 527 F.3d 176, 180 (D.C. Cir. 2008) [hereinafter *Adena*].

The Hospitals' reliance on *Adena* is misplaced. There, the District of Columbia Circuit reviewed a provision in the Medicare Act that expressly refers to the Medicaid statute, 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II), and also uses the phrase "medical assistance." 527 F.3d at 180. In applying the principle that courts should presume that "identical words used in different parts of the same act are intended to have the same meaning," the *Adena* court held that the phrase "medical assistance" in the Medicare Act should have the same meaning as that applied in the Medicaid Act. *Id.* Here, however, the

Hospitals point to no such language appearing in both the Medicare and Medicaid Acts that should be subject to this canon. Accordingly, *Adena* is inapplicable. In sum, because Medicare and Medicaid are two separate and independent programs, we cannot conclude that CMS's decisions under Medicaid necessarily control her decisions under Medicare, such that the Decision at issue here was arbitrary, capricious or contrary to law.

### D. The Decision that the Access Payments were refunds was not an arbitrary and capricious reversal of long-standing policy

The Hospitals' fourth contention on appeal is that the Decision should be set aside as arbitrary and capricious because it constitutes a reversal of long-standing policy. In support, the Hospitals rely on *United States v. Mead Corp.*, for the proposition that courts consider a host of factors in assessing the weight that a final agency decision is due. 533 U.S. 218, 228, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) [hereinafter *Mead*]. Without further elaboration, the Hospitals assert that consistency is one of the most important factors and that where an agency's interpretation of a relevant provision is inconsistent with the agency's earlier interpretation, it must be set aside as arbitrary and capricious.

The Hospitals' reliance on *Mead* merits discussion. There, the Supreme Court merely expanded upon its prior decision in *Chirstensen v. Harris County*, 529 U.S. 576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000), and held that tariff classification rulings issued by the United States Customs

Service, while not deserving of *Chevron* deference, deserved respect proportional to their "power to persuade" under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). In *Christensen*, the Supreme Court clarified that agency interpretations contained in formats such as opinion letters, policy statements, agency manuals, and enforcement guidelines (as opposed to an interpretation arrived at after a formal adjudication or notice-and-comment rulemaking) were entitled to respect under *Skidmore*, but only to the extent that those interpretations had the power to persuade. 529 U.S. at 587, 120 S.Ct. 1655. In *Christensen*, the Supreme Court continued to recognize that under *Chevron* courts "must give effect to an agency's regulation containing a reasonable interpretation of an ambiguous statute." *Id.* (citing *Chevron*, 467 U.S. at 842-44, 104 S.Ct. 2778). Under *Skidmore*, the Supreme Court declared that the weight of an administrative ruling "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U.S. at 140, 65 S.Ct. 161. *Mead* discussed the *Skidmore* factors, such as an agency's consistency, in the context of denying *Chevron* deference to the tariff classification ruling therein at issue because such rulings are more akin to policy statements and agency manuals. 533 U.S. at 228-231, 121 S.Ct. 2164. The interpretation at issue here, however, was arrived at after a formal adjudication and therefore the *Skidmore* factors are inapplicable. The more appropriate standard to apply is the standard enunciated in *Thomas Jefferson*

*University*, requiring substantial deference of an agency's interpretation of its regulations such that the agency's interpretation is controlling unless plainly erroneous or inconsistent with the regulation. 512 U.S. at 512, 114 S.Ct. 2381; *see also Christensen*, 529 U.S. at 588, 120 S.Ct. 1655 (noting that an agency's interpretation of its own regulation is entitled to deference where the language of the regulation is ambiguous).

While we need not look at the *Skidmore* factors here, where an agency has changed course it is "obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first place." *Motor Vehicles Mfrs. Ass'n*, 463 US. at 42, 103 S.Ct. 2856. Were HHS to have abandoned a long-standing policy and taken a new direction, we would require a reasoned analysis of its reasons for doing so. The Administrator's Decision, however, does not constitute such a change in course. Prior to this case, HHS had not issued any construction of the statute or applicable regulations that was in tension with the application here of the regulatory provisions at issue.

### 1.  Whether the Administrator's actions are inconsistent with long-standing policy

According to the Hospitals, CMS has not previously taken the position that taxes paid by hospitals must be offset by Medicaid or other State funds received for services that were funded by the taxes. Rather, the Hospitals assert that CMS has allowed Medicare reimbursement of these taxes consistent with Manual Section 2122

without any offset for a provider's receipt of such funds. On reply, and as discussed at oral argument, however, the Hospitals concede that "CMS has not previously promulgated a regulation that expressly stated provider taxes were not to be offset by Medicaid payments." The Hospitals nonetheless attempt to point to prior Board decisions that demonstrate an implicit policy.

As evidence of the alleged past policy, the Hospitals cite to five prior Board decisions involving the reimbursement of taxes, two CMS decisions (*Kindred Hosp. v. Wisconsin Physician Servs.*, 2009 WL 6049415, at *1 (H.C.F.A. Sept. 29, 2009); *Florida Group Appeal-Indigent Tax v. Blue Cross and Blue Shield Ass'n, Inc.*, PRRB Dec. Nos. 90-D61 and 90-D62, CCH Medicare and Medicaid Guide ¶ 38,934 (Sept. 20, 1990), *aff'd*, HCFA Admr. Dec. (CCH) ¶ 38,935 (Nov. 20, 1990)), and an Office of Inspector General report regarding the Missouri provider tax program. According to the Hospitals, these cases demonstrate that "'refunds' do not include Medicaid payments to the Hospitals for patient services in situations where there is also present a provider tax that is used to fund the payments."

The handful of prior Board decisions the Hospitals rely upon to purportedly show HHS's long-standing policy are not determinative. Our precedent instructs that Board decisions are not the decisions of the Secretary or her Administrator and are not authoritative. *Cmty. Care Found. v. Thompson*, 318 F.3d 219, 227 (7th Cir. 2003) ("There is no authority for the proposition that a lower component of a government agency may bind the decision making of the highest level."). While such decisions may offer

guidance to providers, they "carr[y] no more weight on review by the Secretary than any other interim decision made along the way in an agency where the ultimate decision of the agency is controlling." *St. Francis Hosp. Ctr.*, 714 F.2d at 874 (quoting *Homan & Crimen, Inc. v. Harris*, 626 F.2d 1201, 1205 (5th Cir. 1980)). "Final responsibility for rendering a decision lies in the agency itself, not with subordinate hearing officers . . . ." *Id.* Furthermore, the Board decisions relied upon by the Hospitals did not directly address the issue of offsets. In *Florida Group Appeal*, the Administrator affirmed a Board decision addressing the question of the appropriate fiscal year in which Florida hospitals could claim an indigent care tax assessment as a reimburseable expense. PRRB Dec. Nos. 90-D61 and 90-D62, CCH Medicare and Medicaid Guide ¶ 38,934 (Sept. 20, 1990), *aff'd*, HCFA Admr. Dec. CCH Medicare and Medicaid Guide ¶ 38,935 (Nov. 20, 1990)*. Florida Group Appeal* did not involve a question as to the amount of costs the Florida hospitals actually incurred. The line of cases discussing the Minnesota provider taxes are also distinguishable in that the Minnesota statute therein at issue did not involve payments of any kind to offset the amount of taxes paid by the hospitals. Because none of the cases involve the precise issue that was before the Administrator in this case, the Administrator's Decision was not inconsistent.

The Hospitals' reliance on *Kindred Hospitals* is similarly unhelpful. The issue in *Kindred Hospital* involved the proper treatment of payments providers received from a privately-administered pooling arrangement in which certain Missouri hospitals participated. 2009 WL 6049415,

at *4. The providers in *Kindred Hospitals* were Medicare-certified providers in Missouri that were subject to a State tax and were also participants in the pooling arrangement. *Id.* at *5. On their Medicare cost reports, the providers reported their tax payments, listed the pool payments they received as Medicaid revenue, and claimed the amount of the tax as an allowable expense. *Id.* The Administrator concluded that the pool payments must be used to offset the tax, and that the actual costs incurred were properly determined with respect to the tax payment once the related pool payment was recognized and offset. *Id.* at *8.

On appeal to the district court, the Western District of Missouri affirmed the Administrator's decision. *Kindred Hospitals East, LLC v. Sebelius*, No. 10-00073-CV-W-HFS, 2011 WL 4729735, at *9 (W.D.Mo. Oct. 5, 2011). In affirming the Administrator's decision, the district court relied on *Sta-Home Health Agency, Inc.*, 34 F.3d at 305-09, and explained that contrary to the provider's suggestion, "actual cost cannot be computed by merely 'following the money' or isolating the accounting events. Instead, the courts have allowed the Administrator to scrutinize the substance of the transaction to determine cost actually incurred." 2011 WL 4729735, at *6.[8] Nonetheless,

---

[8] The Eighth Circuit recently affirmed the district court's conclusion and held that the Administrator had acted within her "statutory authority to scrutinize the substance of the relationship between the [State] tax and the pool payments to determine whether there was a Medicare reimbursable cost."

(continued...)

the Hospitals argue that *Kindred Hospitals* helps their case because although the intermediary did offset the pool payments the hospitals received, it did not offset Medicaid payments that the hospitals received directly from the State against any amount of the provider tax. This amounts to an argument that because HHS might have also challenged other aspects of the Missouri tax program, but did not, HHS's decision not to challenge those aspects amounts to an agency policy that the unchallenged aspects of the Missouri tax program comply with Medicare. A federal agency does not establish policy by *not* taking administrative action, however. *See Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170, 125 S.Ct. 577, 160 L.Ed.2d 548 (2004) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.").

In sum, the Administrator's decision here was not inconsistent with a prior policy statement. Even if it were arguably inconsistent, the Administrator was not required to explain a departure from previous interpretations. *See Pre-Fab Transit Co. v. United States*, 595 F.2d 384, 387 (7th Cir. 1979) (noting that "[a]dministrative agencies are not bound by the doctrine of stare decisis" and that courts may not reverse an agency determina-

---

[8] (...continued)
*Kindred Hosps. East, LLC v. Sebelius*, No. 11-3555, 2012 WL 2012 WL 3965925, at *3 (8th Cir. Sept. 12, 2012).

tion simply because the agency determination may arguably be inconsistent with prior agency decisions) (citing *Sawyer Transport, Inc. v. United States*, 565 F.2d 474, 477 (7th Cir. 1977)).

## 2. Whether CMS's policy clarification fails to refute its "prior position" that provider taxes are allowable without offset

In May 2010, shortly after the Administrator's Decision was issued, CMS published a "Proposed Clarification of Payment Policy for Provider Taxes" in the Federal Register, 65 Fed. Reg. 23,852, 24,018-19 (May 4, 2010), which was adopted as final without change in August 2010. 75 Fed. Reg. 50,042, 50,362-64 (Aug. 16, 2010). The Hospitals assert that CMS's policy clarification was intended to bolster CMS's litigating position in this case and is an effort to gloss over changes in Medicare reimbursement policy, and therefore it is deserving of no deference.

In the Final Rule, CMS noted that there was confusion relating to the determination of whether a tax is an allowable tax, and that much of the confusion had arisen because it was possible to read sections 2122.1 and 2122.2 of the Manual "as permitting all taxes assessed on a provider by a State that are not specifically listed in Section 2122.2 to be treated as allowable costs." 75 Fed. Reg. at 50,362-63. CMS proposed to amend the Manual "[i]n situations in which payments that are associated with [an] assessed tax are made to providers specifically to make the provider whole or partly whole for the

tax expenses," so that Medicare only recognized the net expense incurred by the provider. *Id.* at 50,363.

While it is clear that "[d]eference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate," *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), here, the Secretary has not taken such a position. The Secretary has not relied on the policy clarification to justify its denial of the Hospitals' claims. *See Gonzales v. Reno*, 325 F.3d 1228, 1350 (11th Cir. 2003) (noting that "[a]n after-the-fact rationalization of agency action—an explanation developed for the sole purpose of defending in court the agency's acts—is usually entitled to no deference from the courts," but concluding that the agency's position, developed in the course of administrative proceedings before litigation commenced is not such a justification). Importantly, while the policy clarification was issued a few months after the Administrator's Decision, HHS issued the proposed clarification before the Hospitals filed this action in district court. Accordingly, the Secretary's position is in no sense "a post hoc rationalization[ ]" advanced by an agency seeking to defend its actions against attack. *Georgetown Univ. Hosp.*, 488 U.S. at 212.

### E.   The Decision did not establish a new rule that fails to comply with the APA

The Hospitals' final contention on appeal is that the Decision must be set aside because it establishes a new substantive legal standard for Medicare reimbursement

that is invalid because it was not adopted in compliance with the APA's notice and comment requirements, and because it cannot be retroactively applied.[9] As an initial matter, and as discussed above, the Decision did not constitute a departure from a previous position. *See Homemakers North Shore, Inc. v. Bowen*, 832 F.2d 408, 413 (7th Cir. 1987) (court's conclusion that Secretary had not changed positions necessarily disposed of providers' contention that Secretary's change to regulatory language required Secretary to follow APA's notice and comment requirements prior to making change). Even if it had, however, we find that the Decision properly qualifies as an adjudication and therefore the Secretary was not required to follow the APA's notice and opportunity for comment requirements.

Under the APA, an administrative agency must publish in the Federal Register "substantive rules of general applicability . . . and statements of general policy or interpretations of general applicability formulated and adopted by the agency" as well as "each amend-

---

[9] In support of their argument that the Decision creates a substantive change in Medicare reimbursement law, the Hospitals rely on the testimony of an expert witness, Sheree Kanner. Ms. Kanner testified that she was not aware of any prior case where hospitals were required to offset Medicaid revenues received from States against provider tax assessments for purposes of claiming Medicare allowable costs. As the Secretary points out however, Ms. Kanner only claimed expert status on *Medicaid* and not on *Medicare* reimbursements, the focus of this appeal. Accordingly, we discount her testimony.

ment, revision, or repeal of the foregoing." 5 U.S.C. § 552(a)(1)(D)-(E); 5 U.S.C. § 553(b) (requiring agencies to publish "[g]eneral notice of proposed rule making"); *see also Bd. of Trs. of Knox Cnty. Hosp. v. Shalala*, 135 F.3d 493, 500 (7th Cir. 1998). A rule is defined as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . ." 5 U.S.C. § 554(4).

An adjudication, in contrast to rulemaking, "means agency process for the formulation of an order[.]" 5 U.S.C. § 554(7). Under the APA, all interested parties in an adjudication must have the opportunity for "the submission and consideration of facts, arguments, offers of settlement, or proposals of adjustment[.]" 5 U.S.C. § 554(c)(1). "Adjudications typically 'resolve disputes among specific individuals in specific cases, whereas rulemaking affects the rights of broad classes of unspecified individuals.'" *City of Arlington, Tex. v. F.C.C.*, 668 F.3d 229, 242 (5th Cir. 2012) (quoting *Yesler Terrace Cmty. Counsel v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994)). "[B]ecause adjudications involve concrete disputes, they have an immediate effect on specific individuals (those involved in the dispute). Rulemaking, in contrast, is prospective, and has a definitive effect on individuals only after the rule subsequently applied." *Yesler Terrace Cmty. Counsel*, 37 F.3d at 448.

Here, the Decision has the hallmarks of an adjudication. The Medicare Act provides that providers of services

contesting the amount of reimbursement due as determined by an intermediary may request a hearing before the Board, and it further instructs that a Board decision "shall be based upon the record made at such hearing." 42 U.S.C. §§ 1395oo(a), (d). The Decision utilized the hearing procedures outlined in the Medicare Act, it involved a concrete dispute between the parties and had an immediate, concrete effect on the parties to the dispute. Furthermore, the Decision did not affect a broad class of unspecified individuals. *See Yesler Terrace Cmty. Counsel*, 37 F.3d at 448. We therefore conclude that the Decision was an adjudication.

Furthermore, it is well-established that "[a]n agency is not precluded from announcing new principles in an adjudicative proceeding rather than through notice-and-comment rule-making." *Negrete-Rodriguez v. Mukasey*, 518 F.3d 497, 503 (7th Cir. 2008); *see also City of Arlington, Tex.*, 668 F.3d at 240. "Nor is there any basis for suggesting that the Secretary has a statutory duty to promulgate regulations that, either by default rule or by specification, address every conceivable question in the process of determining equitable reimbursement." *Guernsey Mem'l Hosp.*, 514 U.S. at 96, 115 S.Ct. 1232. As the Supreme Court has noted, the Secretary has issued a set of comprehensive and detailed regulations, which consume hundreds of pages of the Code of Federal Regulations. *Id.* "As to particular reimbursement details not addressed by her regulations, the Secretary relies upon an elaborate adjudicative structure which includes the right to review by the [Board], and, in some instances, the Secretary, as well as judicial review in

federal district court of agency action." *Id.* "The APA does not require that all the specific applications of a rule evolve by further, more precise rules rather than by adjudication." *Id.* In our view, the Secretary's method of determining that the Tax Assessments must be offset by the Access Payments via an adjudication is a proper exercise of her statutory mandate. *See id.*

The Hospitals' reliance on *American Federation of Government Employees, AFL-CIO, Local 3090 v. Federal Labor Relations Authority*, 777 F.2d 751, 752 (D.C. Cir. 1985), is not on point. There, the Federal Labor Relations Authority ("FLRA") dismissed a complaint and ignored the plain language in regulations pertaining to when the filing of exceptions stayed an arbitration award. *American Federation of Government Employees, AFL-CIO, Local 3090*, 777 F.2d at 752-53. In vacating the FLRA's order, the District of Columbia Circuit reasoned that "[w]ere the Authority's approach proper, administrative agencies could effectively repeal legislative rules and abandon longstanding interpretations of statutes indirectly, by adjudication, without providing affected parties any opportunity to comment on the proposed changes, and without providing any significant explanation for their departure from established views." *Id.* at 759. This is simply not what happened here.

The Hospitals also rely on *Alaska Professional Hunters Association, Inc. v. Federal Aviation Administration*, where the District of Columbia Circuit held that although an agency may give its regulation an interpretive rule without offering the opportunity for notice and comment,

"'[o]nce an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking.'" 177 F.3d 1030, 1033-34 (D.C. Cir. 1999) (quoting *Paralyzed Veterans of Am. v. D.C. Arena*, 117 F.3d 579, 586 (D.C. Cir. 1997)). But, *Alaska Professional Hunters Association, Inc.* conflicts with the APA's rulemaking provisions, which exempt all interpretive rules from notice and comment, and with our own precedent and is therefore not persuasive. 5 U.S.C. § 553(b)(3)(A); *Metro. Sch. Dist. of Wayne Twp, Marion Cnty., Ind. v. Davila*, 969 F.2d 485, 488-89 (7th Cir. 1992) (noting that an interpretive rule "does not trigger the APA's notice and comment requirement"); *Bd. of Trs. of Knox Cnty. Hosp.*, 135 F.3d at 501 (noting that "an agency is not bound by the APA's procedural requirements when announcing 'interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice'"); *cf. Paragon Health Network, Inc.*, 251 F.3d at 1147 n.4 (declining to consider the District of Columbia Circuit's position expressed in *Alaska Professional Hunters Association, Inc.*, 177 F.3d at 1033-34, that an agency must follow notice and comment procedures to change a previous interpretation of a regulation).

The Hospitals also argue that even if CMS's change in position were considered a non-substantive change in interpretation, it is still arbitrary, and rely on *Continental Web Press, Inc. v. National Labor Relations Board*, 742 F.2d 1087, 1093 (7th Cir. 1984). In *Continental Web Press*, the Board had succeeded in developing a clear policy through a course of adjudications "and to discard the

policy without explanation was arbitrary." *Id.* at 1094. Unlike *Continental Web Press*, however, here, a clearly developed policy had not been created through a series of Board opinions and therefore it is inapplicable. Indeed, as we noted in *Continental Web Press*, where the Board applies the common law technique to its adjudications, "[f]inding distinctions is not reversing course; it is not like first deciding that cars must be equipped with airbags and then that they need not be; it calls for no special explanation." 742 F.2d at 1093.

The Hospitals' final argument is that the rule announced cannot be retroactively applied. Because we find that no such new rule was announced, however, we decline to address this argument.

### III.  CONCLUSION

For the foregoing reasons, we affirm the thoughtful and carefully drafted opinion of the district court.